In the Interest of A.T.S., Minor Child, Appellant.

No. 89–144.

Court of Appeals of Iowa.

Nov. 27, 1989.

Paul R. Huscher of Paul R. Huscher Law Offices, Des Moines, for appellant child.

Thomas J. Miller, Atty. Gen., Kathrine S. Miller–Todd, Asst. Atty. Gen., and F. Montgomery Brown, Asst. County Atty., for appellee State.

Considered by DONIELSON, P.J., and SCHLEGEL and HAYDEN, JJ.

DONIELSON, Presiding Judge.

A.T.S., a thirteen-year-old boy, was accused of sexually abusing an eleven-month-old boy while baby-sitting him. He was adjudicated to be delinquent due to the commission of second-degree sexual abuse. He has appealed. A.T.S. contends the juvenile court should have suppressed certain pretrial statements he made in the presence of his mother and an investigating officer. He contends the record does not establish he had voluntarily waived his right to counsel, after invoking his fifth-amendment right to have an attorney present before answering any more questions.

A.T.S. also challenges the sufficiency of the evidence to establish he committed the crime of second-degree sexual abuse. Finally, A.T.S. contends the juvenile court's findings of fact and conclusions of law were not sufficiently specific to meet the requirements of Iowa Code section 232.-47(8).

*Motion to Suppress.* A.T.S. contends the trial court erred in not suppressing statements he made after invoking his fifth-amendment right to counsel. Since this assignment of error presents a federal constitutional issue, we make an independent evaluation of the totality of the evidence from which the assertion of unconstitutionality arises. We review the evidence de novo. *State v. Snethen,* 245 N.W.2d 308, 311 (Iowa 1976).

The record in this case reveals Officer Gries contacted the mother of A.T.S. on September 13, 1988, and asked her to bring her son to the police station for questioning the next day. A.T.S. and his mother arrived at the station shortly before 8:00 a.m. They met with Officer Gries in his office. He informed A.T.S. he was a suspect in the alleged sexual abuse of M.F., an eleven-month-old baby A.T.S. had baby-sat on August 10, 1988. A.T.S. and his mother were informed of his *Miranda* rights. A.T.S. was thirteen years of age at the time, and his mother characterized him as being of average intelligence. A.T.S. indicated he understood his rights, and he and his mother each signed a waiver and consent form provided by the officer.

After the waiver forms had been signed, Officer Gries began to question A.T.S. After approximately five minutes, Officer Gries asked A.T.S. his first confrontational question—one which questioned the veracity of A.T.S.'s version of the events. When asked why there was baby oil all over the house, A.T.S. stated, "I'm not saying another word without an attorney." The officer then told A.T.S. he could question him no further because he had requested an attorney. Officer Gries then led A.T.S. to a bench in the front lobby of the police station. The officer told A.T.S., "[y]ou can have a seat on the bench out front and I'm going to talk with your mother a little bit."

Officer Gries returned to his office and spoke with the mother for nearly an hour. They both felt A.T.S. was hiding some-

thing. They discussed what knowledge A.T.S. may have had as to the involvement of others in the crime. When asked who decided A.T.S. should be returned to the office, Officer Gries stated the mother had said, "I feel [A.T.S.]—if, you know, if he would tell the truth we could find out more about this." Officer Gries told the mother he agreed with her, but he could not approach A.T.S. and question him because he had asked for an attorney. Officer Gries testified he told the mother he could not initiate another conversation with A.T.S.; A.T.S. would have to initiate any further conversation himself. The officer indicated he took some time to make sure the mother understood why he could not reapproach A.T.S.

According to Officer Gries' testimony at the suppression hearing, it was at this point in his conversation with the mother, that she said, "[w]ell, if we could have [A.T.S.] come back in and talk to you, then maybe I would be able to explain to him first what he needs to say." Officer Gries then said, "[o]kay. [W]ith your thought I will go and ask him to come back in." Officer Gries stated A.T.S. was brought back into the office. The following excerpt from the hearing is Officer Gries' description of what occurred when A.T.S. was returned to the office:

> I explained to [A.T.S.] that he'd been called back in because his mother and I had been visiting about the possibility of him knowing something. I could not—I reminded him of the fact that he had asked for an attorney, that he still did not have to say anything further, and he did not have to talk to me at all.[1]

And his mother then said to him something on the order of "[A.T.S.], I don't think you did anything. I think you know what [D.S.] did and you're trying to cover for [D.S.], and I don't want you to do that. I don't want you lying about it.

According to Officer Gries, the mother continued to make similar statements and A.T.S. became somewhat emotional and began to make statements in response to his mother's questions and statements. Officer Gries resumed his questioning and told A.T.S., "if you want to tell me what you know then, I'll, you know, then we can start the tape recorder again and we'll get it on tape."[2]

■■■ At issue is whether statements made by A.T.S. after he invoked his fifth-amendment rights should have been suppressed in the adjudicatory hearing.[3] If an individual indicates in any manner, at any time prior to or during questioning, that he or she wants an attorney, an interrogation must cease until an attorney is present. *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694, 723 (1966). The exercise of this right must be scrupulously honored. *Id.* at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. It is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused if he has clearly asserted his right to counsel. *Arizona v. Roberson*, 486 U.S. 675, 680, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704, 713 (1988). Reinterrogation may only occur if the accused himself initiates further communication, exchanges, or conversations with the police. *Id.* at 680, 108 S.Ct. at 2097, 100 L.Ed.2d at 713.

■■■ Once the right to counsel has been invoked, a valid waiver of that right cannot be established by showing only that

---

**1.** Officer Gries' notes of the interrogation contained no reference to his advising A.T.S. of his right to silence and to an attorney, when he was brought back into the office.

**2.** For some unexplained reason the tape recording of the interrogation was not available for the hearing on the motion to suppress.

**3.** No issue appears to have been raised regarding the "custodial" nature of the questioning and whether *Miranda* warnings were even re-

quired in this case. Because detailed *Miranda* warnings were given, and a written waiver of rights was voluntarily obtained from A.T.S., it is not significant whether or not the interrogation which followed is characterized as custodial or noncustodial. The rules for determining voluntariness subsequent to valid *Miranda* warnings are the same regardless of the characterization of the setting in which the interrogation took place. *State v. Mayberry*, 411 N.W.2d 677, 683 (Iowa 1987).

an accused has responded to further police-initiated interrogation, even if the accused has been advised of his rights. *State v. Lamp*, 322 N.W.2d 48, 55 (Iowa 1982) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981). Interrogation within the meaning of *Miranda* is not limited to the asking of questions; it includes police conduct which is calculated to, expected to, or likely to, evoke admissions. *Snethen*, 245 N.W.2d at 313.

■ Officer Gries' behavior in this case was conduct intended to elicit statements from A.T.S. after he had invoked his right to counsel, and when interrogation was to have ceased. He spent nearly an hour with A.T.S.'s mother. She was understandably extremely upset because both of her sons had been implicated in the sexual abuse of an eleven-month-old child. Officer Gries obviously took advantage of her emotional state and convinced her, that while he could not initiate a conversation with A.T.S., it would be all right for her to prod her son into making further statements in the officer's presence. Officer Gries used this mother to circumvent A.T.S.'s invocation of his fifth-amendment rights. The following excerpt from the officer's testimony indicates he returned A.T.S. to his office, and this was done because the mother felt she could persuade A.T.S. to tell more of his story to the officer:

Q. And who went out to the front lobby to get [A.T.S.] to bring him back into the—into your office? A. I did.

· Q. And your purpose in doing that, as I understand it, after your conversation with [A.T.S.]'s mother was to hope that through his mother you'd be able to get the rest of the story, is that correct? A. That's the impression the mother left me with as to going out and getting him. She had indicated to me that she felt something [was] there and she thought that [A.T.S.] would tell me.

The circumstances surrounding A.T.S.'s subsequent statements reflect a coercive and oppressive atmosphere. We cannot find he voluntarily initiated the conversation and questioning with Officer Gries. A.T.S. sat for an hour on a police station bench after he had invoked his right to counsel. He was then returned to the office and was told he had been called back in because the officer and mother had been visiting "about the possibility of him knowing something." His mother then proceeded to question and coax him in the presence of the officer. Confrontation between a mother and son, and manipulation of the desire to exonerate or implicate another, can put an inherently coercive psychological pressure on an accused. *Snethen*, 245 N.W.2d at 313. Taking into consideration the relevant case law, and the factors set forth in Iowa Code section 232.47(6), this court cannot conclude A.T.S. initiated the resumption of dialogue with Officer Gries.

The State argues A.T.S.'s statements were rendered in response to his mother's questioning and were not the product of official coercion. They cite *State v. Snethen*, 245 N.W.2d 308 (Iowa 1976), in support of this proposition. *Snethen* is distinguishable in that the version of events believed by the Iowa Supreme Court in *Snethen*, did not entail any conduct by the police. Any prompting of the defendant in *Snethen* to talk to the officers, came from the family members and was not induced by police conduct or questions. *Id.* at 314. "The officers did not arrange the confrontation between the [family members] and defendant." *Id.* In the case at hand, Officer Gries manipulated the situation so as to elicit further statements from A.T.S. after he had invoked his right to counsel. Officer Gries testified as to how he tried to clarify to the mother how he could not reapproach A.T.S., and it had to be A.T.S. who initiated any conversation. Yet Officer Gries seemed entirely oblivious as to what effect his official role and the police station setting, would have on the mother, and her "decision" to return A.T.S. to the office for further questioning. Officer Gries clearly arranged the confrontation between mother and son which resulted in

A.T.S. making subsequent inculpatory statements. The failure to scrupulously honor A.T.S.'s fifth-amendment rights rendered these statements inadmissible.

Our decision with regard to the suppression issue renders it unnecessary to address A.T.S.'s other claims. The decision of the trial court is reversed and remanded.

REVERSED AND REMANDED.